UNITED STATES DISTRICT
COURT DISTRICT OF
MASSACHUSETTS

| | |
|---|---|
| HAL SALZMAN, and MAYA NORTON individually and on behalf of all others similarly situated, | Case No.: |
| Plaintiffs, | CLASS ACTION COMPLAINT |
| v. | |
| THE 3M COMPANY, ARKEMA INC., BASF CORPORATION, CHEMDESIGN PRODUCTS INC., CHEMGUARD, INC., CORTEVA, INC., DEEPWATER CHEMICALS, INC., DUPONT DE NEMOURS INC., DYNAX CORPORATION, E. I. DUPONT DE NEMOURS AND COMPANY, NATIONAL FOAM, INC., THE CHEMOURS COMPANY, and THE CHEMOURS COMPANY FC, LLC, | |
| Defendants. | |

## **COMPLAINT**

Pursuant to Federal Rule of Civil Procedure 23, Plaintiff Hal Salzman and Maya Norton (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, allege the following based upon the investigation of Plaintiffs' counsel, information and belief, personal knowledge, and a review of publicly available information.

1

## INTRODUCTION

1.      Residents of the Town of Boxborough, Massachusetts and the surrounding area (hereinafter, "Boxborough") draw their drinking water from private wells.  For several years, residents have unknowingly consumed water contaminated with a family of chemicals called perfluoroalkyl and polyfluoroalkyl substances, commonly referred to as PFAS. When consumed, PFAS can cause many serious illnesses.

2.      PFAS are sometimes referred to as "forever chemicals" because they only dissipate or break down in the environment after an extraordinarily long time. As water-soluble compounds, they easily migrate from release sites, including that of CBK Automotive Repair, Inc., through surface soils into surface water like rivers and lakes, and eventually into aquifers that feed drinking water wells.

3.      There are thousands of different and discrete chemicals in the PFAS family of chemicals. Perfluorooctanoic acid ("PFOA") and perfluorooctanoic sulfonic acid or (PFOS) are two members of the dangerous PFAS chemical family and may be the most extensively produced and studied of the family. PFOA and PFOS do not naturally degrade in the environment.

4.      Although the health hazards of PFOA, PFOS and other PFAS have long been known to their makers (as detailed below) and others, the United States Environmental Protection Agency (EPA) issued a health advisory for PFOA and PFOS in 2016, advising against ingesting water contaminated with PFOA and PFOS over 70 parts per trillion (ppt). In June 2022, the EPA issued an updated interim drinking water health advisory for PFOA and PFOS. The updated advisory levels, which consider lifetime exposure, indicate that some adverse health effects may occur

2

with concentrations of PFOA or PFOS in water near zero.[1] At the same time, EPA also issued

final health advisories for two other PFAS, perfluoro butane sulfonic acid and its potassium salt

(PFBS) and for hexafluoropropylene oxide (HFPO) dimer acid and its ammonium salt. These

chemicals are often referred to as "GenX chemicals".[2] On April 10, 2024, EPA published the

final human health toxicity assessments for PFOA and PFOS and the final PFAS National

Primary Drinking Water Rule (NPDWR). EPA's Final Maximum Contaminant Levels (MCLs)

for both PFOA and PFOS were zero, but EPA determined the "Final MCL (enforceable levels

would be set at 4.0 parts per trillion for each PFOA and PFOS."[3]

5.     The Commonwealth of Massachusetts, through the Massachusetts Department of

Environmental Protection ("MassDEP"), published a PFAS drinking water standard or

Massachusetts maximum contaminant level ("MMCL") of 20 nanograms per liter (ng/L), or parts

per trillion (ppt) applicable to drinking water sources such as private wells for the sum of the

concentrations of six specific PFAS. The six PFAS are: (1) perfluorooctanesulfonic acid (PFOS);

(2) perfluorooctanoic acid (PFOA); (3) perfluorohexanesulfonic acid (PFHxS); (4)

perfluorononanoic acid (PFNA); (5) perfluoroheptanoic acid (PFHpA); and (6) perfluorodecanoic

acid (PFDA). MassDEP abbreviates this set of six PFAS as "PFAS6."[4]

6.     The PFAS that contaminates Plaintiffs' properties and wells entered the

groundwater in Boxborough at a Massachusetts Avenue area property operated by CBK

Automotive Repair, Inc. ("CBK") following a multi-vehicle fire where a large volume of

Aqueous Film Forming Foam, known as "AFFF," was applied to extinguish the fire. CBK

---

[1] Website accessed 4/10/2025 at https://www.epa.gov/sdwa/drinking-water-health-advisories-pfoa-and-pfos
[2] Id.
[3] Website accessed 4/10/2025 https://www.epa.gov/sdwa/human-health-toxicity-assessment-perfluorooctanoic-acid-pfoa
[4] Website accessed 4/10/2025 at https://www.mass.gov/info-details/per-and-polyfluoroalkyl-substances-pfas#what-are-pfas-and-why-are-they-a-problem?-

operates the property located at 795 Massachusetts Avenue as a tow yard and automotive repair shop.

7.    The contamination will have repercussions for property values in the impacted community. Prospective buyers will likely be wary of health risks and the possible financial burden of dealing with PFAS contamination, including the installation and maintenance of point of entry treatment ("POET") systems. Boxborough's appeal as a desirable residential suburb could therefore be impacted as the community works to address this environmental challenge, affecting the local real estate market.

8.    Plaintiffs therefore bring this action against the Defendants for harm resulting from the contamination of their drinking water and real property with hazardous levels of toxic, carcinogenic chemicals manufactured, supplied, and/or sold by Defendants.

9.    Defendants are the companies responsible for designing, manufacturing, selling, supplying, and/or distributing the chemicals and/or products which caused the contamination of Boxborough's water supplies.

10.    Defendants knew the chemicals and/or products to be unsafe but represented the opposite and continued manufacturing and selling the chemicals.

11.    Defendants failed to warn Plaintiffs, members of the Class, and the public of specific, substantial risks to human health, profiting immensely.

## PARTIES

### I.    PLAINTIFFS

12.    Hal Salzman is a Massachusetts citizen domiciled on Cobleigh Road, Boxborough, Massachusetts.

13.     Plaintiff Maya Norton is a Massachusetts citizen domiciled on Cobleigh Road, Boxborough, Massachusetts.

## II.     DEFENDANTS

14.     The term "Defendants" refers to all Defendants named herein jointly and severally.

A.     The AFFF Defendants

15.     The term **"AFFF Defendants"** refers collectively to Defendants 3M Company, Chemguard, Inc., and National Foam, Inc.

16.     **Defendant The 3M Company f/k/a Minnesota Mining and Manufacturing Co. ("3M")** is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 3M Center, St. Paul, Minnesota 55144-1000. Beginning before 1970 and until at least 2002, 3M designed, manufactured, marketed, distributed, and sold AFFF containing PFAS, including but not limited to PFOA and PFOS.

17.     **Defendant Chemguard, Inc. ("Chemguard")** is a corporation organized under the laws of the State of Texas, with its principal place of business located at One Stanton Street, Marinette, Wisconsin 54143. On information and belief, Chemguard designed, manufactured, marketed, distributed, and sold AFFF products containing PFAS, including but not limited to PFOA and PFOS. On information and belief, Chemguard was acquired by Tyco International Ltd. in 2011.

18.     **Defendant National Foam, Inc. ("National Foam")** is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 141 Junny Road, Angier, North Carolina 27501. Beginning in or around 1973, National Foam designed, manufactured, marketed, distributed, and sold AFFF containing

PFAS, including but not limited to PFOA and PFOS. National Foam currently

manufactures the Angus brand of AFFF products and is a subsidiary of Angus International

Safety Group. National Foam merged with Chubb Fire Ltd. to form Chubb National Foam,

Inc. in or around 1988. On information and belief, Chubb is or has been composed of

different subsidiaries and/or divisions, including but not limited to, Chubb Fire & Security

Ltd., Chubb Security, PLC, Red Hawk Fire & Security, LLC, and/or Chubb National

Foam, Inc. (collectively referred to as "Chubb"). Chubb was acquired by Williams

Holdings in 1997. Angus Fire Armour Corporation had previously been acquired by

Williams Holdings in 1994. On information and belief, Williams Holdings was demerged

into Chubb and Kidde P.L.C. in or around 2000. On information and belief, when Williams

Holdings was demerged, Kidde P.L.C. became the successor in interest to National Foam

System, Inc. and Angus Fire Armour Corporation. Kidde P.L.C. was acquired by United

Technologies Corporation in or around 2005. Angus Fire Armour Corporation and

National Foam separated from United Technologies Corporation in or around 2013.

19.     The AFFF Defendants designed, manufactured, marketed, distributed, and

sold AFFF products containing PFOS, PFOA, and/or their chemical precursors that were

stored, handled, used, trained with, tested equipment with, otherwise discharged, and/or

disposed at the CBK property in Boxborough, Massachusetts.

B.    The Fluorosurfactant Defendants

20.   The term **"Fluorosurfactant Defendants"** refers collectively to Defendants

3M, Arkema Inc., BASF Corporation, ChemDesign Products Incorporated, Deepwater

Chemicals, Inc., Dynax Corporation, E.I. DuPont de Nemours and Company, The

Chemours Company, The Chemours Company FC, LLC, Corteva, Inc., and DuPont de Nemours Inc.

21. **Defendant Arkema Inc.** is a corporation organized and existing under the laws of Pennsylvania, with its principal place of business at 900 First Avenue, King of Prussia, PA 19406. Arkema Inc. develops specialty chemicals and polymers. Arkema, Inc. is an operating subsidiary of Arkema France, S.A. Arkema Inc. designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

22. **Defendant BASF Corporation ("BASF")** is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 100 Park Avenue, Florham Park, New Jersey 07932. BASF is the successor-in-interest to Ciba. Inc. (f/k/a Ciba Specialty Chemicals Corporation). Ciba Inc. designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

23. **Defendant ChemDesign Products Inc. ("ChemDesign")** is a corporation organized under the laws of Delaware, with its principal place of business located at 2 Stanton Street, Marinette, WI, 54143. ChemDesign designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

24. **Defendant Deepwater Chemicals, Inc. ("Deepwater")** is a corporation organized under the laws of Delaware, with its principal place of business located at 196122 E County Road 40, Woodward, OK, 73801. Deepwater Chemicals designed, manufactured,

marketed, distributed, and sold fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

25.    **Defendant Dynax Corporation ("Dynax")** is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 103 Fairview Park Drive, Elmsford, New York 10523. Dynax entered the AFFF market on or about 1991 and quickly became a leading global producer of fluorosurfactants and fluorochemical stabilizers containing PFOS, PFOA, and/or their chemical precursors. Dynax designed, manufactured, marketed, distributed, and sold fluorosurfactants and fluorochemical stabilizers containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

26.    **Defendant E.I. du Pont de Nemours & Company ("DuPont")** is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805.

27.    **Defendant The Chemours Company ("Chemours Co.")** is a limited liability company organized under the laws of the State of Delaware, with its principal place of business located at 1007 Market Street, P.O. Box 2047, Wilmington, Delaware, 19899. In 2015, DuPont spun off its performance chemicals business to Chemours Co., along with vast environmental liabilities which Chemours Co. assumed, including those related to PFOS and PFOA and fluorosurfactants. Chemours Co. has supplied fluorosurfactants containing PFOS and PFOA, and/or their chemical precursors to manufacturers of AFFF products. Chemours Co. was incorporated as a subsidiary of DuPont as of April 30, 2015. From that time until July 2015, Chemours Co. was a wholly-owned subsidiary of DuPont. In July 2015, DuPont spun off Chemours Co. and transferred

to Chemours Co. its "performance chemicals" business line, which includes its fluoroproducts business, distributing shares of Chemours Co. stock to DuPont stockholders, and Chemours Co. has since been an independent, publicly-traded company.

28.    **Defendant The Chemours Company FC, LLC ("Chemours FC")** is a limited liability company organized under the laws of the State of Delaware, with its principal place of business located at 1007 Market Street, Wilmington, Delaware, 19899.

29.    **Defendant Corteva, Inc. ("Corteva")** is a corporation organized and existing under the laws of Delaware, with its principal place of business at 974 Centre Rd., Wilmington, Delaware 19805.

30.    **Defendant Dupont de Nemours Inc**. **f/k/a DowDuPont, Inc. ("Dupont de Nemours Inc.")** is a corporation organized and existing under the laws of Delaware, with  its principal place of business at 974 Centre Road, Wilmington, Delaware 19805 and 2211 H.H. Dow Way, Midland, Michigan 48674. On June 1, 2019, DowDuPont separated its agriculture business through the spin-off of Corteva. Corteva was initially formed in February 2018. From that time until June 1, 2019, Corteva was a wholly-owned subsidiary of DowDuPont. On June 1, 2019, DowDuPont distributed to DowDuPont stockholders all issued and outstanding shares of Corteva common stock by way of a pro-rata dividend. Following that distribution, Corteva became the direct parent of E. I. Du Pont de Nemours & Co. Corteva holds certain DowDuPont assets and liabilities, including DowDuPont's agriculture and nutritional businesses. On June 1, 2019, DowDuPont, the surviving entity after the spin-off of Corteva and of another entity known as Dow, Inc., changed its name to DuPont de Nemours, Inc., to be known as DuPont ("New DuPont"). New DuPont retained assets in the specialty products business lines following the above-described spin-offs, as

well as the balance of the financial assets and liabilities of E.I DuPont not assumed by Corteva. Defendants E. I. Du Pont de Nemours and Company; The Chemours Company; The Chemours Company FC, LLC; Corteva, Inc.; and DuPont de Nemours, Inc. are collectively referred to as "DuPont" throughout this Complaint. DuPont designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

31.   3M and Chemguard also designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

32.   Defendants collectively represent the entire, or nearly the entire, market for AFFF Products used in Boxborough, Massachusetts.

33.   All Defendants, at all times material herein, acted by and through their respective agents, servants, officers and employees, actual or ostensible, who then and there were acting within the course and scope of their actual or apparent agency, authority or duties. Defendants are liable based on such activities, directly and vicariously.

34.   Plaintiffs allege that each named Defendant is in some manner responsible for the acts alleged herein and that they proximately caused injuries to Plaintiffs and members of the Class, as alleged herein.

35.   Plaintiffs allege that each named Defendant derived substantial revenue from the equipment, materials, and/or chemicals that are the subjects of this lawsuit. Defendants designed, developed, manufactured, tested, packaged, promoted, marketed, advertised, distributed, and/or sold the equipment, materials, and/or chemicals in Massachusetts and caused harm to Plaintiffs and members of the Class in Massachusetts.

36.  Defendants expected or should have expected their actions to have consequences in Massachusetts.

37.  Defendants purposefully availed themselves of the privilege of conducting activities in Massachusetts, thus invoking the benefits and protections of its laws.

## JURISDICTION AND VENUE

38.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because it is a class action where the aggregate claims of all members of the proposed Class exceed $75,000 exclusive of interests and costs, and the Plaintiffs and members of the proposed Class are citizens of a state different from each Defendant.

39.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and (c) because each Defendant transacts business in, is found in, and/or has agents in this District, and because some of the actions giving rise to this Complaint took place within this District.

40.  This Court has personal jurisdiction over Defendants because Defendants have maintained substantial contacts, and/or committed overt acts in furtherance of the conduct alleged in the Complaint throughout the United States, including within Massachusetts. The conduct was directed at, or had the effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including within Massachusetts.

## SUBSTANTIVE ALLEGATIONS

## I.    GENERAL ALLEGATIONS REGARDING PER- AND POLYFLUOROALKYL SUBSTANCES

41.  Per- and polyfluoroalkyl substances ("PFAS" or "PFAS Chemicals") are a class of thousands of synthetic chemical compounds, which consist of nearly indestructible chains of carbon and fluorine atoms.

42.  PFAS do not exist naturally in the environment.

43.  PFAS were first developed in the 1930s and 1940s.

44.  PFAS' high chemical and thermal stability have led to their use in a wide range of commercial products and industries.

45.  PFAS' same qualities cause them to persist in the environment and in the human body for long (if not indefinite) periods of time, earning them the nickname "forever chemicals."

46.  In recent decades, researchers, environmentalists, and government agencies have raised concerns regarding the persistence and toxicity of PFAS, as well as the ability of PFAS to absorb into and bioaccumulate in the human body.  Such concerns have prompted a dramatic increase in epidemiological studies regarding the adverse effects of PFAS exposure on human health.

47.  Peer-reviewed scientific research reflecting the best and most recent scientific information available has cautioned that any amount of PFAS exposure is hazardous to human health.

48.  PFAS exposure in humans can occur via dermal absorption, as well as ingestion and inhalation. PFAS also spread through humans by crossing the placenta from mother to fetus and by passing to infants through breast milk.

49.  When exposed to heat, PFAS can off-gas, break down, and degrade into highly mobile and toxic particles and dust,[5] increasing the risk of PFAS exposure via dermal absorption, ingestion, and inhalation.

---

[5] A.S. Young et al., *Per- and Polyfluoroalkyl Substances (PFAS) and Total Fluorine in Fire Station Dust,* J. Expo. Sci. Environ. Epidemiology (2021), https://doi.org/10.1038/s41370-021-00288-7.

50. PFAS exposure has been linked to multiple, serious adverse health effects in humans, including various cancers, tumors, liver damage, immune system and endocrine disorders, high cholesterol, thyroid disease, ulcerative colitis, birth defects, decreased fertility, and pregnancy-induced hypertension.

51. PFAS have been found to concentrate in human blood, bones, and organs.

52. PFAS are associated with immediate changes to human cells upon exposure. For example, a recent study by the Yale School of Public Health found that PFAS chemicals promote cancer cell migration within the human body. Specifically, the study observed that cells bathed in PFAS chemicals "boosted the cells' migration ability" with the cells "show[ing] a tendency to spread and to penetrate membranes", a "key feature" of metastasis.[6] Another recent study confirmed that certain blood serum PFAS concentrations are associated with changes in immune cells. The study suggested "that PFAS exposures event at relatively low levels are associated with changes in immune cell subpopulations", which impact the functioning of humans' immune systems.[7]

53. The thousands of PFAS in existence can be divided into two categories: non-polymeric and polymeric.

54. Thus far, most research has focused on the adverse effects of non-polymeric PFAS on human health rather than polymeric PFAS.

---

[6] *Yale Study: "Forever Chemicals" Promote Cancer Cell Migration*, Yale School of Public Health, https://medicine.yale.edu/lab/cjohnson/news-article/yale-study-forever-chemicals-promote-cancer-cell-migration/.
[7] Amanda R. Tursi et al., *Immune cell profiles associated with human exposure to perfluorinated compounds (PFAS) suggest changes in natural killer, T helper, and T cytotoxic cell subpopulations*, Science Direct, Environmental Research (2024), https://doi.org/10.1016/j.envres.2024.119221 (https://www.sciencedirect.com/science/article/pii/S0013935124011265).

55. Non-polymeric PFAS include the two most widely used PFAS Chemicals: Perfluorooctanoic Acid ("PFOA") and Perfluorooctane Sulfonate ("PFOS").

56. PFOA and PFOS bioaccumulate in humans' blood and organs, including the kidneys and the liver.

57. PFOA and PFOS interfere with the human body's functions, including the functions of the organs and immune systems, leading to adverse health outcomes.

58. PFOA or PFOS exposure in any detectable amount is hazardous to human health. In fact, negative health effects may occur because of exposure to PFOA and PFOS at levels below most laboratories' ability to detect at this time.

59. The following is a non-exhaustive list of adverse health outcomes that can result from exposure to PFOA and PFOS, many of which can manifest after years of exposure:

    a. increased risk of kidney cancer, testicular cancer, thyroid cancer, prostate cancer, bladder cancer, breast cancer, and ovarian cancer;

    b. reduced ability of the body's immune system to fight off infections, including reduced vaccine response;

    c. interference with the body's natural hormones and liver enzymes;

    d. changes in liver enzymes;

    e. reproductive effects including decreased fertility;

    f. developmental effects or delays in children, including low birthweight, accelerated puberty, bone variations, or behavioral changes;

    g. increased cholesterol levels and/or risk of obesity;

    h. increased risk of high blood pressure or pre-eclampsia in pregnant women;

and

i. interference with and suppression of vaccine response (decreased serum antibody concentrations) in children.

60. PFOA has additionally been observed to cause Leydig cell tumors, pancreatic cancer cell tumors, and hepatocellular adenomas in rats.

61. PFOS has additionally been observed to cause potentially human relevant tumors, including hepatocellular tumors in male and female rats and pancreatic islet cell carcinomas in male rats.

62. The United States Environmental Protection Agency ("EPA") has classified both PFOA and PFOS as likely human carcinogens.

63. The EPA has concluded that there is no safe level of PFOA or PFOS exposure in human beings.

64. In 2022, the EPA initiated a proposed rulemaking to designate PFOA and PFOS as hazardous substances under the Comprehensive Environmental Response, Compensation, and Liability Act. In support of this rulemaking, the EPA stated that "evidence indicates that these chemicals may present a substantial danger to public health or welfare or the environment[.]"

65.    On or around April 10, 2024, the EPA finalized a National Primary Drinking Water Regulation (NPDWR) establishing legally enforceable levels, called Maximum Contaminant Levels (MCLs), for six PFAS in drinking water. The EPA also finalized health-based, non- enforceable Maximum Contaminant Level Goals (MCLGs) for the six PFAS. Notably, the MCLGs for both PFOA and PFOS were listed as "Zero":

| Compound | Final MCLG | Final MCL (enforceable levels) |
|---|---|---|
| PFOA | Zero | 4.0 parts per trillion (ppt) (also expressed as ng/L) |
| PFOS | Zero | 4.0 ppt |
| PFHxS | 10 ppt | 10 ppt |
| PFNA | 10 ppt | 10 ppt |
| HFPO-DA (commonly known as GenX Chemicals) | 10 ppt | 10 ppt |
| Mixtures containing two or more of PFHxS, PFNA, HFPO-DA, and PFBS | 1 (unitless) Hazard Index | 1 (unitless) Hazard Index |

66.    The International Agency for Research on Cancer ("IARC") has classified PFOA as "carcinogenic to humans" based on strong evidence that it has some of the key properties of a carcinogen in people who are exposed to it and sufficient evidence it can cause cancer in lab animals.

67.    The IARC has classified PFOS as "possibly carcinogenic to humans" based on strong evidence that it has some key properties of a carcinogen in people who are exposed to it and limited evidence that it can cause cancer in lab animals.

68.    In 2022, the California Office of Environmental Health Hazard Assessment ("OEHHA") listed PFOA as a chemical known to the state of California to cause cancer.

69.    While most research has focused on the adverse effects of non-polymeric PFAS on human health (e.g., PFOA and PFOS), the production, manufacturing, and use of

polymeric PFAS is also hazardous to human health.[8]

70. Polymeric PFAS include fluoropolymers and side-chain fluorinated polymers.

71. Fluoropolymers include polytetrafluorethylene ("PTFE"), one of the most well- known and commonly used PFAS Chemicals.

72. The use of fluoropolymers (including PTFE) in manufacturing and commercial products poses substantial risks to human health.

73. When PTFE is used in commercial products such as textiles, other PFAS used in the manufacturing process will generally be present and pose substantial risks to human health.

74. Peer-reviewed scientific research has cautioned that:

   a. "there is no sufficient evidence to consider fluoropolymers as being of low concern for environmental and human health";

   b. "a blanket statement that [fluoropolymers] cannot enter cells is factually inaccurate";

   c. "there is no scientific basis to separate and subsequently remove fluoropolymers from discussions of other PFAS as a class or in terms of their impacts on human or environmental health";

   d. "[t]he conclusion that all fluoropolymers are of low concern . . .

---

[8] Lohmann R, Cousins IT, DeWitt JC, Glüge J, Goldenman G, Herzke D, Lindstrom AB, Miller MF, Ng CA, Patton S, Scheringer M, Trier X, Wang Z. *Are Fluoropolymers Really of Low Concern for Human and Environmental Health and Separate from Other PFAS?* Environ Sci Technol. 2020 Oct 20;54(20):12820-12828. doi: 10.1021/acs.est.0c03244. Epub 2020 Oct 12. PMID: 33043667; PMCID: PMC7700770.

ignores major [PFAS] emissions linked to their production," among other issues; and

f. it would be impossible to verify the safety of all fluoropolymer products on the market based on the information available in the public domain.[9]

75. The use of side-chain fluorinated polymers in manufacturing and commercial products poses substantial risks to human health.

76. The use of side-chain fluorinated polymers in manufacturing and commercial products such as textiles can lead (and often leads) to the formation of non-polymeric PFAS (e.g., PFOA and PFOS), which can then contaminate (and often contaminate) human beings, as well as the environment.

77. The EPA has denied certain exemptions to side-chain fluorinated polymers as a result of the serious risks involved in their use.[10]

78. The EPA has cautioned that it "can no longer conclude that [side-chain fluorinated polymers] 'will not present an unreasonable risk to human health or the environment.'"[11]

## II. DEFENDANTS' KNOWLEDGE OF THE DANGERS OF PFAS

79. Given the extensive publicly available research and growing body of scientific understanding over the past several decades concerning the harms of PFAS, each

---

[9] *Id.*

[10] US EPA. *Premanufacture Notification Exemption for Polymers; Amendment of Polymer Exemption Rule to Exclude Certain Perfluorinated Polymers*; 2010; Vol. 75.

[11] *Id.*

named Defendant knew or should have known of the dangers PFAS poses to human health and the environment.

### A. Defendant 3M's Long-Standing Knowledge of the Dangers of PFAS

80.    Defendant 3M was the largest manufacturer of PFAS in the United States from the 1940s through the early 2000s.

81.    3M has known for decades that PFAS exposure is associated with adverse, substantial, and potentially lethal effects on human health.

82.    As early as the 1950s, 3M began a series of studies on the physiological and toxicological properties of PFAS, concluding that PFAS were harmful to animals, humans, and the environment. The findings of these studies were discussed internally (and often shared with DuPont) but were not publicized or shared with any regulatory agencies. Notably:

      a.    In 1950, 3M documented that PFAS bioaccumulate in the blood of mice following exposure.

      b.    In 1963, 3M documented PFAS as being "toxic," stable in the environment, and "completely resistant to biological attack."

      c.    By the 1970s, 3M had documented PFAS in fish and were aware that PFAS were hazardous to marine life.

      d.    In 1975, 3M learned that there was a "universal presence" of PFAS in human blood samples taken from across the United States.

      e.    In 1976, 3M began monitoring the blood of its employees for

PFAS because the company was concerned about potential health effects.

f.  In 1978, 3M conducted multiple PFOA and PFOS studies in monkeys and rats. The studies showed that PFOA and PFOS affected the liver and gastrointestinal tract of the animals tested. 3M documented that PFAS "should be regarded as toxic."

g.  In 1978, 3M had to abort a study when all of the test monkeys died within the first few days or weeks after being given food contaminated with PFOS. The deaths were attributed to the "compound effect" of PFOS.

h.  In 1979, an internal 3M report discussing the studies on PFOA and PFOS stated that the PFAS were "more toxic than anticipated," recommending that "lifetime rodent studies []
be undertaken as soon as possible."[12]

i.  In 1979, an internal 3M memo concluded that it was "paramount to begin now an assessment of the potential (if any) of long term (carcinogenic) effects for these compounds which are known to persist for a long time in the body and thereby give long term chronic exposure."[13]

j.  In 1981, 3M moved twenty-five female employees "of

---

[12] Sharon Lerner, *3M Knew About Dangers of Toxic Chemicals Decades Ago, Internal Documents Show*, THE INTERCEPT (July 31, 2018, 12:23 PM), https://www.typeinvestigations.org/investigation/2018/07/31/3m-knew-dangers-pfoa-pdos-decades-ago-internal-documents-show/.
[13] *Id.*

childbearing potential" off production lines at its Decatur, Alabama plant "[a]s a precautionary measure" based on internal researching showing that PFAS were causing birth defects in rats.

k.  In 1987, 3M shared with DuPont the results of a two-year study where rats were fed a diet with added PFAS, resulting in the growth of cancerous tumors.

l.  In 1989, a review of mortality data among 3M's chemical division workers found, compared to Minnesota death rates, a "statistically significant excess" of deaths by "cancer of the digestive organs and peritoneum."

83.  Section 8(e) of the Toxic Substances Control Act (TSCA) requires chemical manufacturers and distributors to immediately notify the EPA if they have information that "reasonably supports the conclusion that such substance or mixture presents a substantial risk of injury to health or to the environment." TSCA § 8(e), 15 U.S.C. § 2607(e). This reporting requirement has been included in the TSCA since its enactment in 1976. See Pub. L. 94-469, Title I, § 8, Oct. 11, 1976, 90 Stat. 2027.

84.  Despite the decades of alarming data, 3M did not share any of its concerns about the risks of PFAS with regulatory agencies until 1998, when the company submitted a TSCA § 8(e) letter to the EPA regarding PFOS.

85.  In 1998, the EPA first learned that PFAS was in the blood of the general human population. Shortly thereafter, 3M produced over 1,000 studies it had previously withheld from the EPA.

86.  In 2006, 3M agreed to pay the EPA a penalty of more than $1.5 million after being cited for violations of the TSCA, including violations for failing to disclose studies regarding PFOS, PFOA, and other PFAS.

87.  In 2022 and following a multi-year probe into both companies, the state of California announced that it was suing 3M, along with DuPont, for manufacturing PFAS with knowledge of its carcinogenic properties. In response, 3M spokesperson Carolyn LaViolette released a statement that the company "acted responsibly in connection with products containing PFAS and will defend its record of environmental stewardship."[14]

88.  The same year, 3M announced that it would work to discontinue the use of PFAS across its product portfolio by the end of 2025. In its announcement, 3M fell far short of transparency: Mike Roman, 3M's chairman and chief executive officer, asserted that "[w]hile PFAS can be safely made and used, we also see an opportunity to lead in a rapidly evolving external regulatory and business landscape for those we serve."[15] In connection with the announcement, 3M falsely maintained that "3M's products are safe for their intended uses."[16]

### B.    Defendant DuPont's Long-Standing Knowledge of the Dangers of PFAS

89.    Prior to spinning off portions of the company into other entities, DuPont was the largest chemical company in the world in terms of sales.

---

[14] *California sues 3M, DuPont over toxic 'forever chemicals'*, CNN (Nov. 10, 2022, 7:48 PM), https://www.cnn.com/2022/11/10/business/california-3m-dupont/index.html.

[15] *3M to Exit PFAS Manufacturing by the End of 2025*, 3M (Dec. 20, 2022), https://news.3m.com/2022-12-20-3M-to-Exit-PFAS-Manufacturing-by-the-End-of-2025.
[16] *Id.*

90.    Dupont has known for decades that PFAS exposure is associated with adverse, substantial, and potentially lethal effects on human health.

91.    In 1935, DuPont established Haskell Laboratories, one of the first in-house toxicology facilities, at the urging of a staff doctor worried over the company's demonstrated "tendency to believe [chemicals] are harmless until proven otherwise."[17]

92.    In 1954, a DuPont employee named R.A. Dickinson noted that he had received an inquiry regarding PFOA's "possible toxicity."[18]

93.    As early as the 1960s, DuPont was repeatedly made aware, via both internal and external research and data, that PFAS were harmful to animals, humans, and the environment. Notably:

   a.    In 1961, a team of in-house researchers at DuPont concluded that PFOA was indeed toxic and should be "handled with extreme care." By 1962, a series of experiments by in-house researchers at DuPont had confirmed that PFOA was associated with the enlargement of various, specific organs in rats.[15]

   b.    In 1965, fourteen employees at DuPont, including the then-director of Haskell Laboratories, received a memo describing preliminary studies that even low doses of a related surfactant could increase the size of rat's livers, a classic response to exposure to a poison.

   c.    In 1978, Dupont alerted employees to the results of a study done by 3M, which showed that 3M's employees were accumulating PFOA in

---

[17] Sheron Lerner, *The Teflon Toxin: DuPont and the Chemistry of Deception*, THE INTERCEPT (Aug. 11, 2015, 6:35 PM), https://theintercept.com/2015/08/11/dupont-chemistry-deception/.
[18] *Id.*

their blood. Later the same year, DuPont began reviewing employee medical records and measuring the levels of PFOA in the blood of its own workers, noting adverse patterns including increased rates of endocrine disorders.

d.  By 1979, Dupont was aware of studies showing that beagles exposed to PFOA had abnormal enzyme levels "indicative of cellular damage" as well as a recent 3M study showing that some rhesus monkeys died when exposed to PFOA.[19]

e.  In 1981, DuPont transferred women out of work assignments with potential for exposure to PFOA, alerting them to the results of a 3M study which suggested an association between PFAS exposure and birth defects.

f.  By 1982, DuPont's corporate medical director had become worried about the possibility of "current or future exposure of members of the local community from emissions leaving the plant's perimeter," as he explained in a letter to a colleague.[20]

g.  By the 1990s, DuPont knew that PFOA caused cancerous testicular, pancreatic, and liver tumors in lab animals.

h.  In the 1990s, DuPont began developing an alternative to PFOA. In 1993, an interoffice memo announced that "for the first time, we have a viable candidate" that appeared to be less toxic and stayed in the body

---

[19] *Id.*
[20] *Id.*

for a much shorter duration of time. "Discussions were held at DuPont's corporate headquarters to discuss switching to the new compound. DuPont decided against it [because] [p]roducts manufactured with PFOA were an important part of DuPont's business, worth $1 billion in annual profit."[21]

    i.    In 1994, a small committee drafted a top-secret document, which was distributed to high-level DuPont employees around the world, discussing the need to "evaluate replacement of [PFOA] with other more environmentally safe materials" and presenting evidence of toxicity, which included study finding an association between prostate cancer and exposure to PFOA.[22]

94.    In 2000, DuPont and 3M met to "clear [the parties'] mutual understanding of the pertinent data on PFOA." Meeting notes documented that "DuPont was interested in any measurements of PFOA in general population samples." 3M informed DuPont that the half-life of PFOA was much longer than animal studies showed.[23]

95.    In 2001, a class action lawsuit was filed against DuPont on behalf of people whose water had been contaminated by the nearby DuPont chemical plant where PFAS were manufactured.

---

[21] Nathaniel Rich, *The Lawyer Who Became DuPont's Worst Nightmare*, THE NEW YORK TIMES MAGAZINE (Jan. 6, 2016), https://www.nytimes.com/2016/01/10/magazine/the-lawyer-who-became-duponts-worst-nightmare.html.

[22] Lerner, *supra* note 13.

[23] Internal DuPont Memorandum, DuPont Haskell Laboratory Visit (June 30, 2000), https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1721.pdf.

96.     In 2003, a consultant service with substantial experience helping companies manage issues "allegedly related to environmental exposures," beginning with Agent Orange in 1983, wrote to DuPont in anticipation of a planned meeting:

> The constant theme which permeates our recommendations on the issues faced by DuPont is that DUPONT MUST SHAPE THE DEBATE AT ALL LEVELS. We
> must implement a strategy at the outset which discourages government agencies, the plaintiff's bar, and misguided environmental groups from pursuing this matter any further than the current risk assessment contemplated by the Environmental Protection Agency (EPA) and the matter pending in West Virginia.
> . . .
>
> As we understand this situation, there is currently a great deal of attention focused on the safety of perfluorochemicals generally and PFOA in particular. Specifically, due to the situation in West Virginia and the activities of the Environmental Working Group, the threat of expanded litigation and additional regulation by the EPA has become acute. In response to this threat, it is necessary for DuPont to prepare an overall technical and scientific defense strategy.[24]

97.     In 2005, the EPA reached a settlement with Dupont related to violations of the TSCA for concealing the environmental and health effects of PFOA. The settlement included the largest civil administrative penalty the EPA had ever obtained under any environmental statute, $10.25   million, and further required DuPont to perform supplemental environmental projects worth $6.25 million.

98.     In 2015, DuPont spun off its "performance chemicals" business, as well as two- thirds of its environmental liabilities and 90% of its active litigation, to Defendant Chemours.

99.     In 2019, Paul Kirsch, then-president of the fluoroproducts business at

---

[24] Letter from P. Terrance Gaffney, Esq. of The Weinberg Group to Jane Brooks, Vice President, Special Initiatives, DuPont de Nemours & Company, regarding PFOA (April 29, 2003).

Chemours, testified before Congress that "DuPont designed the separation of Chemours to create a company where it could dump its liabilities and protect itself from environmental cleanup and related responsibilities."

100.    In 2022 and following a multi-year probe into both companies, the state of California announced that it was suing DuPont, along with 3M, for manufacturing PFAS with knowledge of its carcinogenic properties. DuPont's response was to deny its role and maintain that California's claims were without merit:

> DuPont has never manufactured PFOA, PFOS or firefighting foam, said spokesperson Daniel Turner, referring to two PFAS substances. He added the company believes the complaint incorrectly names it as a defendant. "We believe these complaints are without merit . . . We look forward to vigorously defending our record of safety, health and environmental stewardship."[25]

### C.    Defendants' Failure to Warn Plaintiffs and Members of the Class.

101.    As alleged above, Defendants knew or should have known that AFFF containing PFAS was extremely dangerous to citizens living in the vicinity of facilities using AFFF such as the Plaintiffs and members of the Class in that it placed them at increased risk of adverse, substantial, and potentially lethal health effects, including but not limited to various cancers. However, Defendants did not warn the public of such risks.

102.    Quite the opposite—Defendants have continued to misrepresent the safety of PFAS and engaged in campaigns aimed to direct the public's attention away from the issue of PFAS in their products.

103.    Defendant 3M maintains and publicly advertises that "[PFAS] are safely used

---

[25] *California sues 3M, DuPont over toxic 'forever chemicals'*, *supra* note 10.

in many modern products for their important properties and can be safely manufactured."[26]

104.    As to PFOA and PFOS, 3M maintains and publicly advertises that:

Researchers from around the world have studied these materials for decades and haven't found a definitive causal relationship between PFOA or PFOS exposure and any health condition.    While some research shows that these materials are associated with negative health outcomes, other studies don't reach the same conclusions.[27]

105.    Defendant New DuPont maintains and publicly advertises that:

In June 2019, DuPont de Nemours, Inc. (DuPont) was established as a new multi- industrial specialty products company. DuPont de Nemours has never manufactured PFOA, PFO or firefighting foam. While DuPont is not a PFAS commodity chemical manufacture, it does use select PFAS compounds within industrial processes pursuant to relevant environmental, health and safety rules and standards. Such uses are necessary to impart specific product performance criteria and only in products that are essential to safety and the critical functioning of society.[28]

106.    Defendant Chemours maintains and publicly advertises that: "We take very seriously our obligation to manage the PFAS compounds in our manufacturing processes in a responsible manner and our commitment to eliminate at least 99% of our PFAS air and water emissions from our manufacturing processes by 2030." Chemours further maintains and publicly advertises that "not all PFAS are the same," arguing that fluoropolymers such as PTFE are "critical to modern life" and "enable nearly every major sector of the economy."

107.    In 2022, Defendant 3M publicly stated that it was not necessary or appropriate to declare any PFAS hazardous.

---

[26] *Health, Safety & Environmental Stewardship*, 3M, https://pfas.3m.com/health-safety-and-environmental-stewardship (last visited June 17, 2024).
[27] *How Fluorochemistries Are Safely Used*, 3M, https://pfas.3m.com/how-fluorochemistries-are-safely-used (last visited June 17, 2024).
[28] *DuPont de Nemours, Inc. Statement on Poly and Per-Fluorinated Alkyl Substances (PFAS)*, DUPONT, https://www.dupont.com/pfas.html (last visited June 17, 2024).

108.   Moreover, Defendants have repeatedly represented to the Plaintiffs, members of the Class, and the public that their products were safe for their intended uses, including the ways in which Plaintiffs have alleged they were used.

### III.   DEFENDANTS' MANUFACTURE AND SALE OF AFFF/COMPONENT PRODUCTS.

109.   AFFF is a type of water-based foam that was first developed in the 1960s to extinguish hydrocarbon fuel-based fires.

110.   AFFF is a Class-B firefighting foam. It is mixed with water and used to extinguish fires that are difficult to fight, particularly those that involve petroleum or other flammable liquids.

111.   AFFF is synthetically formed by combining fluorine-free hydrocarbon foaming agents with fluorosurfactants. When mixed with water, the resulting solution produces an aqueous film that spreads across the surface of hydrocarbon fuel. This film provides fire extinguishment and is the source of the designation aqueous film-forming foam.

112.   Beginning in the 1960s, the AFFF Defendants designed, manufactured, marketed, distributed, and/or sold AFFF products that used fluorosurfactants containing either PFOS, PFOA, or the chemical precursors that degrade into PFOS and PFOA.

113.   AFFF can be made without the fluorosurfactants that contain PFOA, PFOS, and/or their precursor chemicals. Fluorine-free firefighting foams, for instance, do not release PFOA, PFOS, and/or their precursor chemicals into the environment.

114.   AFFF that contains fluorosurfactants, however, is better at extinguishing hydrocarbon fuel-based fires due to their surface-tension lowering properties, essentially smothering the fire and starving it of oxygen.

115.    The fluorosurfactants used in 3M's AFFF products were manufactured by 3M's patented process of electrochemical fluorination ("ECF").

116.    The fluorosurfactants used in other AFFF products sold by the AFFF Defendants were manufactured by the Fluorosurfactant Defendants through the process of telomerization.

117.    The Fluorosurfactant Defendants were aware that the fluorosurfactants they designed, manufactured, marketed, distributed, and/or sold would be used in the AFFF products designed, manufactured, marketed, distributed, and/or sold by the AFFF Defendants.

118.    The Fluorosurfactant Defendants designed, manufactured, marketed, distributed, and/or sold the fluorosurfactants contained in the AFFF products discharged into the environment at the CBK property in Boxborough, Massachusetts during fire response activities, resulting in widespread PFAS contamination which requires costly and significant response actions by Plaintiff.

119.    The AFFF Defendants designed, manufactured, marketed, distributed, and/or sold the AFFF products discharged into the environment at the CBK property during fire response activities, resulting in widespread PFAS contamination which requires costly and significant response actions by Plaintiff.

120.    AFFF containing PFOS and/or PFOA, once it has been released to the environment, lacks characteristics that would enable identification of the company that manufactured that particular batch of AFFF or chemical feedstock.

121.    A subsurface plume, even if it comes from a single location, such as a retention pond or fire training area, originates from mixed batches of AFFF and chemical

feedstock coming from different manufacturers.

122.    Because precise identification of the specific manufacturer of any given AFFF/Component Product that was a source of the PFAS found at CBK and in Plaintiffs' wells is nearly impossible, given certain exceptions, Plaintiffs must pursue all Defendants, jointly and severally. Defendants are also jointly and severally liable because they conspired to conceal the true toxic nature of PFOS and PFOA, to profit from the use of AFFF/Component Products containing PFOS and PFOA, at Plaintiffs' expense, and to attempt to avoid liability, leading residents to incur significant costs for the investigation and remediation of its property under Massachusetts law.

## IV.    DEFENDANTS' HARM TO PLAINTIFFS AND BOXBOROUGH

123.    As alleged above, Plaintiffs are residents of Boxborough, Massachusetts whose property and drinking water have been contaminated by dangerous levels of PFAS chemicals as a result of the use of AFFF at a multi-vehicle fire at CBK Automotive.

124.    The contamination of Boxborough's drinking water with PFAS chemicals began at the CBK Automotive property where AFFF was used to extinguish a fire on December 2, 2020.

125.    In early 2021, MassDEP became aware of the presence of PFAS in nearby potable water wells which are sampled quarterly as part of routine state required monitoring of public potable water supplies, including a detection of total PFAS exceeding the drinking water limit of 20 ng/L from the United Church of Christ daycare located at 723 Massachusetts Avenue, Boxborough.[29]

---

[29] IRA at 11.

126. On April 12, 2022, MassDEP issued a Notice of Responsibility ("NOR") to CBK, identifying Defendant CBK as the Responsible Party for the migration of PFAS from CBK's property in Boxborough, Massachusetts to surrounding private drinking water wells.[30]

127. MassDEP has required the Responsible Party to engage a Licensed Site Professional (LSP) to manage, supervise, or perform all response actions at the disposal site.

128. Eric Simpson of Tg2 Solutions, LLC ("Tg2") was retained on behalf of CBK as the LSP responsible for response actions at the site.

129. Upon information and belief the AFFF and Fluorosurfactant Defendants manufactured PFAS-containing AFFF used by the Boxborough Fire Department to extinguish the multi-vehicle fire on the CBK property that ultimately migrated to the groundwater and contaminated Plaintiffs drinking wells.

130. Testing of surrounding drinking water wells and surface water began immediately and has expanded in scope since. As of writing, testing has taken place or is planned for at least 23 private wells, with several POET system installed, most at the homeowners' expense.

131. Area residents were notified, access for testing was requested, and results distributed in the community throughout the spring and summer of 2022. Upon information and belief, CBK is no longer funding the testing and remediation efforts. Thus, while such testing is ongoing and expanding, residents have been responsible for coordinating and funding these efforts.

---

[30] Notice of Responsibility ("NOR") to CBK.

132.    On October 23, 2023, MassDEP granted CBK Financial Inability ("FI") Status because CBK claimed it did not have the financial ability to pay for Response Actions at the Site.

133.    The level of PFAS6 in many private wells in the area that were contaminated by AFFF used to extinguish the fire that far exceeds the MMCL.

134.    Upon information and belief, the concentration of PFAS6 in these wells has been this high or higher for years.

135.    Massachusetts has recognized the widespread problem of "legacy" AFFF and created a "Legacy Firefighting Foam Take-Back Program" in 2018. As part of the initial outreach on the take-back program done by the Fire Marshal's Office, responses from 105 Fire Departments across the state demonstrated that at least 74 of the 105 Departments surveyed had small to large volumes of legacy foam (pre-2003).[31]

136.    In an Advisory issued by MassDEP in August 2021, it was recommended that Fire Departments "discontinue the use of legacy PFOS and legacy fluorotelemer foams (pre-2003)", and "use modern fluorinated foams only when <u>absolutely tactically necessary</u>."[32]

137.    The presence of PFAS in the drinking water supply immediately stigmatized the community. It has caused fears of present and future health concerns among residents, including residents who are or may become pregnant, who have young children and the elderly, and it has adversely impacted and continues to adversely impact property values, diminished residents' ability to use and enjoy their property and caused significant annoyance, inconvenience, and hardship. The continuing presence of PFAS in their

---

[31] https://www.mass.gov/doc/massdep-legacy-firefighting-foam-take-back-program-2018-project-summary
[32] https://www.mass.gov/doc/pfas-foam-advisory

drinking water has caused and continues to cause fear and uncertainty among Boxborough residents regarding the safety of their water supply, even after filtration systems were installed. For each of these reasons, as well as those described in more detail below, impacted residents of Boxborough are entitled to compensation and other relief.

## **CLASS ALLEGATIONS**

138.    Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2) and (b)(3) on behalf of themselves and the following individuals (the "Class"):

> All persons who own property, or reside at a property in Boxborough, Massachusetts with a drinking water well contaminated with detectible levels of PFAS on or after December 2, 2020.

139.    Plaintiffs reserve the right to expand, narrow, or otherwise modify or refine the definition of the Class based on additional information obtained through further investigation and discovery, and/or to address or accommodate any of the Court's manageability concerns.

140.  Excluded from the Class are: (a) any Judge or Magistrate Judge presiding over the Action and members of their staff, as well as members of their families; (b) Defendants and Defendants' predecessors, parents, successors, heirs, assigns, subsidiaries, and any entity in which any Defendant or its parents have a controlling interest, as well as Defendants' current or former employees, agents, officers, and directors; (c) persons who properly execute and file a timely request for exclusion from the Class; (d) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (e)

counsel for Plaintiffs and Defendants; and (f) the legal representatives, successors, and assigns of any such excluded persons.

141. **Ascertainability.** The proposed Class is readily ascertainable because it is defined using objective criteria to allow class members to determine if they are part of the Class. Members of the class can also be readily identified through publicly available records and/or through records and information in Defendants' possession, custody, or control.

142. **Numerosity.** The Class is so numerous that joinder of individual members is impracticable. While the exact number of members of the Class is not known to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are in excess of forty (40) potential class members.

143. **Commonality and Predominance.** Common questions of fact and law exist for each cause of action and predominate over questions solely affecting individual members of the Class, including the following:

       a.     Whether each Defendants' conduct was negligent;

       b.     Whether Defendants' conduct was willful, wanton, reckless, intentional, malicious, and/or outrageous conduct in utter indifference to and/or conscious disregard for the health, safety, and well-being of others;

       c.     Whether Defendants owed a duty of care to the members of the Class;

       d.     Whether Defendants' conduct constitutes a public nuisance;

       e.     Whether the PFAS contamination described herein substantially interfered with the Plaintiffs' and the members of the Class's use and enjoyment of their properties;

   f.  Whether the PFAS contamination described herein caused, and continues to cause, a continuous invasion of the property rights of the Plaintiffs and the members of the Class Members; and

   g.  Whether Defendants caused the devaluation of the Plaintiffs and members of the Class's properties.

144. **Typicality.** Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and members of the Class sustained damages arising out of Defendants' common course of conduct as described in this Complaint. The injuries of Plaintiffs and each member of the Class were directly caused by Defendants' wrongful conduct, and Plaintiffs and members of the Class assert similar claims for relief.

145. **Adequacy.** Plaintiffs have and will continue to fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained counsel competent and experienced in complex litigation and class actions. Plaintiffs have no interest that is antagonistic to those of the Class, and Defendants have no known defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and they have the resources to do so. Neither Plaintiffs nor Plaintiffs' counsel has any interest adverse to those of the other members of the Class.

146. **Substantial Benefits.** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Classes is impracticable. This proposed class action is manageable. Plaintiffs know of no special difficulty to be encountered in the maintenance of the action that would preclude its maintenance as a class

action.

## TOLLING AND ESTOPPEL OF APPLICABLE STATUTE OF LIMITATIONS

### DISCOVERY RULE TOLLING

147.    Defendants had knowledge of the hazard to the health and safety of Plaintiffs and members of the Class caused by exposure to PFAS Chemicals for decades.

148.    Beginning in the 1960s and continuing through to the 1990s, Defendants conducted internal studies that demonstrated the toxicity of PFAS Chemicals.

149.    Defendants knew or should have known that they were creating an unacceptable health risk to Plaintiffs and members of the Class by designing, manufacturing, and selling AFFF.

150.    Defendants intentionally concealed this information from Plaintiffs and members of the Class, and the public.

151.    Defendants intentionally and continuously misrepresented the safety of the AFFF, PFAS-contaminated materials, and/or PFAS therein, assuring the public that AFFF, PFAS- contaminated materials, and PFAS were safe.

152.    At all relevant times, Plaintiffs and members of the Class did not know or have reason to know of the Defendants' conduct that caused PFAS contamination.

153.    Plaintiffs nor any other members of the Class, through the exercise of reasonable care, could have discovered the conduct by Defendants alleged herein. Further, Plaintiffs and members of the Class did not discover and did not know of facts that would

have caused a reasonable person to suspect that Defendants were engaged in the conduct alleged herein.

154.    For these reasons, all applicable statutes of limitation have been tolled by the discovery rule with respect to claims asserted by Plaintiffs and members of the Class.

<u>FRAUDULENT CONCEALMENT TOLLING</u>

155.    Defendants concealed their conduct and the existence of the claims asserted herein from Plaintiffs and members of the Class for decades and as a result, Plaintiffs could not have reasonably discovered the causes of action alleged herein.

156.  For this reason, applicable limitations of actions and claims, at law or in equity, asserted herein or any statute of limitations that otherwise may apply to the claims of Plaintiffs or members of the Class should be tolled.

<u>FIRST CLAIM FOR
RELIEF</u>

NEGLIGENCE
(Against AFFF Defendants)

157.  Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

158.    The AFFF Defendants owed Plaintiffs and the Class Members a duty of reasonable care to avoid manufacturing, marketing, distributing, and/or selling AFFF/Component Products containing PFAS, including but not limited to PFOS, PFOA, and/or their chemical precursors in a manner that would cause Plaintiffs and the Class Members injury or harm. Plaintiffs and the Class Members were located within the scope of the risk created by the AFFF Defendants' conduct and were foreseeable victims of any

negligent activities by the AFFF Defendants, including the manufacture, marketing, distribution, and/or sale of AFFF/Component Products containing PFAS, including but not limited to PFOS, PFOA, and/or their chemical precursors.

159.    The AFFF Defendants owed Plaintiffs and the Class Members a duty of reasonable care to eliminate or minimize the discharge of PFAS into the soil and water, commensurate with the risk of manufacturing, marketing, distributing, and/or selling AFFF/Component Products containing PFAS, including but not limited to PFOS, PFOA, and/or their chemical precursors.

160.    The AFFF Defendants had a duty to warn users of its AFFF/Component Products containing PFAS, including but not limited to PFOS, PFOA, and/or their chemical precursors of the dangers of releasing PFAS and other toxins into the environment.

161.    The AFFF Defendants breached the above-stated duty by failing to adequately warn and provide sufficient instructions to purchasers of their AFFF/Component Products to avoid discharging PFAS and other toxins into the environment where it was likely to enter the environment including soil, air, and water (including groundwater) and be inhaled, absorbed and/or ingested by residents including Plaintiffs and others in the surrounding communities.

162.    The AFFF Defendants further breached a duty by neglecting to inform itself of the improper way its purchasers mishandled their highly toxic products.

163.    The AFFF Defendants, as manufacturers of AFFF/Component Products containing PFAS, including but not limited to PFOS, PFOA, and/or their chemical precursors knew or should have known that the use of PFAS were leaching from AFFF used for fire protection, training, and response activities.

164.    The AFFF Defendants knew or should have known that PFAS are highly soluble in water, highly mobile, extremely persistent in the environment, and highly likely to contaminate water supplies if released into the environment.

165.    The AFFF Defendants knew or should have known that the manner in which they were designing, manufacturing, marketing, distributing, and/or selling their AFFF/Component Products would result in the contamination of Plaintiff's and Class Members' wells, groundwater (including drinking water), soils, and property with PFAS.

166.    The AFFF Defendants further knew or should have known that it was unsafe and/or unreasonably dangerous to discharge PFAS and other toxins into the environment near surrounding residential communities, including Plaintiffs' and Class Members' residences.

167.    As a direct and proximate result of these acts and omissions, the AFFF Defendants wrongfully caused the environment to be contaminated PFAS and other toxins, thereby exposing Plaintiffs and Class Members to these chemicals and substances, and causing injury as described above.

168.    The AFFF Defendants contributed to the contamination of the environment with PFAS and other harmful substances, and subsequently contributed to Plaintiffs' and Class Members' exposure to these chemicals, thereby causing injury to them.

169.    The acts and omissions of the AFFF Defendants were negligent. As a result, Plaintiffs and Class Members have suffered and/or will in the future suffer damage in the form of bodily injuries, emotional distress, economic loss, and otherwise, for which the AFFF Defendants are liable.

## SECOND CLAIM FOR RELIEF
### BREACH OF WARRANTY FOR FAILURE TO WARN
(Against AFFF Defendants)

170.  Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

171.  Defendants developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, and/or supplied AFFF/Component Products containing PFAS, including but not limited to PFOS, PFOA, and/or their chemical precursors for sale and sold such products to other Defendants in the ordinary course of their businesses.

172.  Upon information and belief, other Defendants utilized the AFFF/Component Products containing PFAS chemicals and other toxins supplied by the AFFF Defendants in a reasonably foreseeable and intended manner.

173.  The AFFF/Component Products containing PFAS, including but not limited to PFOS, PFOA, and/or their chemical precursors sold by the AFFF Defendants were unreasonably dangerous to surrounding community residents, including Plaintiffs and Class Members, without adequate warnings and instructions to prevent discharge of PFAS into the environment and accumulation inside the bodies of residents in surrounding communities, including Plaintiffs and Class Members.

174.  The AFFF Defendants knew or should have known that the AFFF/Component Products containing PFAS, including but not limited to PFOS, PFOA, and/or their chemical precursors they sold would be discharged into the environment and cause contamination of residents' water supply living in the surrounding communities, including Plaintiffs and Class Members.

175.  The AFFF Defendants failed to advise Plaintiffs, Class Members, and other Defendants which were purchasers, users or those foreseeably exposed, to their AFFF/Component Products containing PFAS, including but not limited to PFOS, PFOA,

and/or their chemical precursors about the risks these products posed to foreseeable third parties, such as Plaintiffs and Class Members, and about techniques that could be employed to reduce or eliminate these risks.

176.  The AFFF Defendants had actual knowledge of the health hazards associated with AFFF/Component Products containing PFAS, including but not limited to PFOS, PFOA, and/or their chemical precursors through both animal studies conducted by researchers employed or contracted by such Defendants and through experience with Defendants' own workers, but, upon information and belief, failed to share such information with purchasers, users, or those foreseeably exposed to their products, including Plaintiffs, Class Members, other Defendants, or with governmental agencies.

177. The AFFF Defendants acted with reckless indifference to the health and safety of residents in surrounding communities where its AFFF/Component Products containing PFAS, including but not limited to PFOS, PFOA, and/or their chemical precursors were used by failing to provide adequate warnings of the known dangers of such products when discharged into the environment and ingested by nearby residents, such as Plaintiffs and Class Members.

178. The AFFF Defendants had a duty to warn users of their AFFF/Component Products containing PFAS, including but not limited to PFOS, PFOA, and/or their chemical precursors of the dangers of releasing PFAS into the environment.

179. AFFF Defendants breached the above-stated duty by failing to adequately warn and provide sufficient instructions to purchasers such as other Defendants to avoid discharging PFAS into the environment where it was likely to enter groundwater and be ingested by residents in surrounding communities, including Plaintiffs and Class

Members.

180.  As a direct and proximate result of the AFFF Defendants' acts and omissions, Plaintiffs and Class Members have and will continue to suffer damages.

<u>THIRD CLAIM FOR RELIEF</u>
BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(DEFECTIVE DESIGN)
(Against AFFF Defendants)

181. Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

182. The AFFF Defendants, as manufacturers of AFFF/Component Products containing PFOS, PFOA, and/or their chemical precursors, owed a duty to all persons whom its products might foreseeably harm, including Plaintiffs and Class Members, and not to market any product which is unreasonably dangerous in design for its reasonably anticipated use.

183. The AFFF Defendants' AFFF/Component Products were unreasonably dangerous for its reasonably anticipated uses for the following reasons:

   a) PFAS causes extensive soil and groundwater contamination, even when used in its foreseeable and intended manner; PFAS poses significant threats to public health; and

   b) PFAS creates real and potential environmental damage.

184. The AFFF Defendants knew of these risks and failed to use reasonable care in the design of their AFFF/Component Products.

185. AFFF containing PFOS, PFOA, and/or their chemical precursors poses a greater danger to the environment and to human health than would be expected by ordinary persons such as Plaintiffs, Class Members, and the general public.

186. At all relevant times, the AFFF Defendants were capable of making

AFFF/Component Products that did not contain PFOS, PFOA, and/or their chemical precursors. Thus, reasonable alternative designs existed which were capable of preventing Plaintiffs' and Class Members' injuries, including but not limited to AFFF without intentionally added PFAS.

187. The risks posed by AFFF containing PFOS, PFOA, and/or their chemical precursors far outweigh the products' utility as a flame-control product.

188. The likelihood that the AFFF Defendants' AFFF/Component Products would be spilled, discharged, disposed of, or released into the environment and the contamination of soils and wells in Boxborough far outweighed any burden on the AFFF Defendants to adopt an alternative design, and far outweighed the adverse effect, if any, of such alternative design on the utility of the product.

189. As a direct and proximate result of the AFFF Defendants' unreasonably dangerous design, manufacture, and/or sale of AFFF/Component Products containing PFAS, including but not limited to PFOS, PFOA, and/or their chemical precursors, Plaintiffs' wells, groundwater, soils, and property have become contaminated, requiring costly investigation and remediation under Massachusetts law.

190. The AFFF Defendants knew that it was substantially certain that their acts and omissions described above would contaminate Plaintiffs' and Class Members' wells, groundwater, soils, and property. The AFFF Defendants committed each of the above-described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or reckless disregard for Plaintiffs' health and safety, and/or property rights.

FOURTH CLAIM

<u>FOR RELIEF</u>
PRIVATE
NUISANCE
(Against AFFF Defendants)

191.  Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

192.  At all relevant times, the AFFF Defendants, as manufacturers of AFFF/Component Products containing PFAS, including but not limited to PFOS, PFOA, and/or their chemical precursors, knew or should have known PFAS chemicals were hazardous and harmful to real property, water, and human beings, and it was substantially certain that the method and manner of the AFFF Defendants' PFAS design, manufacture, marketing, distribution, supply, and/or sale of PFAS would cause injuries and property damage to Plaintiffs and the Class Members.

193.  The AFFF Defendants, through the negligent, reckless and/or intentional conduct as alleged in this Complaint, have contaminated the soil, groundwater, and real property owned and/or possessed by Plaintiffs and the Class Members.

194.  The AFFF Defendants created a hazardous condition or activity on property that caused substantial and unreasonable interference with Plaintiffs' and the Class Members' use and enjoyment of their property. The AFFF Defendants' interference has caused and is causing Plaintiffs and the Class Members to, among other things, refrain from using their land to cultivate and grow fruit, vegetables, and other food and to refrain from using their water to drink, cook, or bathe, resulting in significant inconvenience and expense.

195.  The AFFF Defendants' contamination with AFFF/Component Products containing PFAS, including but not limited to PFOS, PFOA, and/or their chemical precursors

of real property owned and/or possessed by Plaintiffs and the Class Members also has substantially interfered otherwise with the Plaintiffs' and Class Members' ability to enjoy their property, to avail themselves of their property's value as an asset and/or source of collateral for financing, and to use their property in the manner that each Class Member chooses.

196. The AFFF Defendants' conduct was intentional, negligent, and reckless, and its conduct constitutes a continuous invasion of the property rights of Plaintiffs and the Class Members.

197. As a direct and proximate result of the AFFF Defendants' design, manufacture, discharge, use, marketing, distribution, supply, and/or sale of AFFF/Component Products containing PFAS, including but not limited to PFOS, PFOA, and/or their chemical precursors and the exposure of the persons and/or property of Plaintiffs and the Class Members to PFAS resulting from the conduct of the AFFF Defendants, Plaintiffs and the Class Members presently suffer, and will continue to suffer, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, annoyance, upset, aggravation, trauma, and inconvenience.

198. Plaintiffs and the Class Members are therefore entitled to damages, costs, and a judgment that the nuisance be abated and removed.

FIFTH CLAIM FOR RELIEF
PUBLIC NUISANCE
(Against AFFF Defendants)

199. Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

200. At all relevant times, the AFFF Defendants knew or should have known

PFAS to be hazardous and harmful to real property and human beings, and it was substantially certain that its design, manufacture, marketing, supply, sale, use, emission, discharge, and/or distribution of AFFF/Component Products containing PFAS, including but not limited to PFOS, PFOA, and/or their chemical precursors would cause injuries and losses to the persons and property of Plaintiffs and the Class Members.

201.    Plaintiffs, the Class Members, and members of the public have a common right to enjoy their real property free of dangerous contamination of their land and water and to live their lives without exposure to unreasonable levels of highly toxic PFAS chemicals.

202.    The AFFF Defendants' conduct in designing, manufacturing, marketing, distributing, supplying, and/or handling of AFFF/Component Products containing PFAS deemed hazardous material under Massachusetts law—has contaminated groundwater that supplies water to Plaintiffs, Class members, and the public and substantially and unreasonably infringes upon and transgresses the public right of Plaintiffs and Class Members to enjoy their real property.

203.    The AFFF Defendants knew or should have known that the AFFF/Component Products containing PFAS, including but not limited to PFOS, PFOA, and/or their chemical precursors they designed, manufactured, supplied, marketed, sold, and/or distributed would have a deleterious effect upon the health, safety, and well-being of people living in Boxborough, Massachusetts and the surrounding areas, including Plaintiffs and Class Members.

204.    The AFFF Defendants' design, manufacture, marketing, supply, sale, and/or distribution of AFFF/Component Products containing PFAS, including but not

limited to PFOS, PFOA, and/or their chemical precursors caused those who owned and/or lived on nearby properties, including Plaintiffs and Class Members, to come into contact with high levels of PFAS on a routine and constant basis, causing substantially elevated health risks resulting from exposure to dangerous levels of PFAS, as well as property damage and diminished property values.

205.    As a direct and proximate result of the AFFF Defendants' design, manufacture, marketing, supply, sale, and/or distribution of AFFF/Component Products containing PFAS, including but not limited to PFOS, PFOA, and/or their chemical precursors, Plaintiffs' and the Class Members' common right to live free of dangerous, toxic substances was eliminated and/or severely diminished.

206.    As a direct and proximate result of the AFFF Defendants' design, manufacture, marketing, supply, sale, and/or distribution of AFFF/Component Products containing PFAS, including but not limited to PFOS, PFOA, and/or their chemical precursors in Boxborough, Massachusetts and the surrounding area, PFAS chemicals contaminated the land and water owned, possessed, and/or used by Plaintiffs and Class Members, thereby exposing their bodies to PFAS.

207.    As a direct and proximate result of the AFFF Defendants' design, manufacture, marketing, supply, sale, and/or distribution of AFFF/Component Products containing PFAS, including but not limited to PFOS, PFOA, and/or their chemical precursors, Plaintiffs and the Class Members will be forced to pay for the private removal of contaminants from their property emanating from pollution of public water sources.

208.    As a direct and proximate result of the AFFF Defendants' design, manufacture, marketing, supply, sale, and/or distribution of AFFF/Component Products

containing PFAS, including but not limited to PFOS, PFOA, and/or their chemical precursors and the resulting exposure of Plaintiffs and Class Members to PFAS, Plaintiffs and Class Members presently suffer, and will continue to suffer, real property damage, out of pocket expenses, personal property damage, loss of use and enjoyment of property, diminution in property value, annoyance, upset, aggravation, trauma, and inconvenience.

SIXTH CLAIM FOR
RELIEF
TRESPASS
(Against AFFF Defendants)

209.    Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

210.    Plaintiffs are the owners, and actual possessors of real property which are routinely used for collecting drinking water.

211.    The AFFF Defendants designed, manufactured, distributed, marketed, and/or sold AFFF/Component Products with the actual knowledge and/or substantial certainty that AFFF containing PFOS, PFOA, and/or their chemical precursors would, through normal use, release PFAS that would migrate into groundwater (including drinking water), causing contamination.

212.    The AFFF Defendants negligently, recklessly, and/or intentionally designed, manufactured, distributed, marketed, and/or sold AFFF/Component Products in a manner that caused PFAS to contaminate Plaintiffs' and Class Members' property, soil, and groundwater.

213.    As a direct and proximate result of the AFFF Defendants' trespass, Plaintiffs and Class Members have suffered and continue to suffer property damage requiring investigation, remediation, and monitoring costs.

214.   The AFFF Defendants knew that it was substantially certain that their acts and omissions described above would threaten public health and cause extensive contamination of property, including groundwater collected for drinking. The AFFF Defendants committed each of the above-described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or reckless disregard for the health and safety of others, and for Plaintiffs' and Class Members' property rights.

<u>SEVENTH CLAIM</u>
<u>FOR RELIEF</u>
NEGLIGENCE
(Against Fluorosurfactant Defendants)

215.   Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

216.   The Fluorosurfactant Defendants owed Plaintiffs and the Class Members a duty of reasonable care to avoid designing, manufacturing, marketing, distributing, and/or selling AFFF/Component Products containing PFAS, including but not limited to PFOS, PFOA, and/or their chemical precursors in a manner that would cause Plaintiffs and the Class Members injury or harm. Plaintiffs and the Class Members were located within the scope of the risk created by the Fluorosurfactant Defendants' conduct and were foreseeable victims of any negligent activities by the Fluorosurfactant Defendants, including the manufacture, marketing, distribution, and/or sale of AFFF/Component Products containing PFAS, including but not limited to PFOS, PFOA, and/or their chemical precursors.

217.   The Fluorosurfactant Defendants owed Plaintiffs and the Class Members a duty of reasonable care to eliminate or minimize the discharge of PFAS into the soil and water, commensurate with the risk of manufacturing, marketing, distributing, and/or selling

AFFF/Component Products containing PFAS, including but not limited to PFOS, PFOA, and/or their chemical precursors.

218.   The Fluorosurfactant Defendants had a duty to warn users of its AFFF/Component Products containing PFAS, including but not limited to PFOS, PFOA, and/or their chemical precursors of the dangers of releasing PFAS into the environment.

219.   The Fluorosurfactant Defendants breached the above-stated duty by failing to adequately warn and provide sufficient instructions to purchasers of their AFFF/Component

220.  Products to avoid discharging PFAS into the environment where it was likely to enter the environment including soil, air, and water (including groundwater) and be inhaled, absorbed and/or ingested by residents including Plaintiffs and others in the surrounding communities.

221. The Fluorosurfactant Defendants further breached a duty by neglecting failing to inform itself of the improper way its purchasers mishandled their highly toxic products.

222. The Fluorosurfactant Defendants, as manufacturers of AFFF/Component Products including PFOS, PFOA, and/or their chemical precursors, knew or should have known that the use of PFAS were leaching from AFFF used for fire protection, training, and response activities.

223.  The Fluorosurfactant Defendants knew or should have known that PFAS are highly soluble in water, highly mobile, extremely persistent in the environment, and highly likely to contaminate water supplies if released into the environment.

224. The Fluorosurfactant Defendants knew or should have known that the

manner in which they were designing, manufacturing, marketing, distributing, and/or selling their AFFF/Component Products would result in the contamination of Plaintiff's and Class Members' wells, groundwater (including drinking water), soils, and property with PFAS.

225. The Fluorosurfactant Defendants further knew or should have known that it was unsafe and/or unreasonably dangerous to discharge PFAS into the environment near surrounding residential communities, including Plaintiffs' and Class Members' residences.

226. As a direct and proximate result of these acts and omissions, the Fluorosurfactant Defendants wrongfully caused the environment to be contaminated PFAS and other toxins, thereby exposing Plaintiffs and Class Members to these chemicals and substances, and causing injury as described above. The Fluorosurfactant Defendants contributed to the contamination of the environment with PFAS and other harmful substances, and subsequently contributed to Plaintiffs' and Class Members' exposure to these chemicals, thereby causing injury to them.

227. The acts and omissions of the Fluorosurfactant Defendants were negligent. As a result, Plaintiffs and Class Members have suffered and/or will in the future suffer damage in the form of property damage and otherwise, for which the Fluorosurfactant Defendants are liable.

<u>EIGHTH CLAIM FOR RELIEF</u>
BREACH OF WARRANTY FOR FAILURE TO WARN
(Against Fluorosurfactant Defendants)

228. Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

229. The Fluorosurfactant Defendants developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, and/or supplied AFFF/Component Products containing PFAS, including but not limited to PFOS, PFOA, and/or their chemical precursors for sale and sold such products to other Defendants in the ordinary course of their businesses.

230. Upon information and belief, other Defendants utilized the AFFF/Component Products containing PFAS chemicals and other toxins supplied by the Fluorosurfactant Defendants in a reasonably foreseeable and intended manner.

231. The AFFF/Component Products containing PFAS, including but not limited to PFOS, PFOA, and/or their chemical precursors sold by the Fluorosurfactant Defendants were unreasonably dangerous to surrounding community residents, including Plaintiffs and Class Members, without adequate warnings and instructions to prevent discharge of PFAS into the Environment and accumulation inside the bodies of residents in surrounding communities, including Plaintiffs and Class Members.

232. The Fluorosurfactant Defendants knew or should have known that the AFFF/Component Products containing PFAS, including but not limited to PFOS, PFOA, and/or their chemical precursors they sold would be discharged into the environment and cause contamination of residents' water supply and accumulation in the blood serum and bodily tissues of residents living in the surrounding communities, including Plaintiffs and Class Members.

233. The Fluorosurfactant Defendants failed to advise Plaintiffs, Class Members, and other Defendants which were purchasers, users, or those foreseeably exposed, to their AFFF/Component Products containing PFAS, including but not limited to PFOS, PFOA,

and/or their chemical precursors about the risks these products posed to foreseeable third parties, such as Plaintiffs and Class Members, and about techniques that could be employed to reduce or eliminate these risks.

234.  The Fluorosurfactant Defendants had actual knowledge of the health hazards associated with AFFF/Component Products containing PFAS, including but not limited to PFOS, PFOA, and/or their chemical precursors through both animal studies conducted by researchers employed or contracted by such Defendants and through experience with Defendants' own workers, but, upon information and belief, failed to share such information with purchasers, users, or those foreseeably exposed to their products, including Plaintiffs, Class Members, other Defendants, or with governmental agencies.

235. The Fluorosurfactant Defendants acted with reckless indifference to the health and safety of residents in surrounding communities where its AFFF/Component Products containing PFAS, including but not limited to PFOS, PFOA, and/or their chemical precursors were used by failing to provide adequate warnings of the known dangers of such products when discharged into the environment and ingested by nearby residents, such as Plaintiffs and Class Members.

236. The Fluorosurfactant Defendants had a duty to warn users of their AFFF/Component Products containing PFAS, including but not limited to PFOS, PFOA, and/or their chemical precursors of the dangers of releasing PFAS into the environment.

237.  The Fluorosurfactant Defendants breached the above-stated duty by failing to adequately warn and provide sufficient instructions to purchasers such as other Defendants to avoid discharging PFAS into the environment where it was likely to enter groundwater and be ingested by residents in surrounding communities, including Plaintiffs

and Class Members.

238. As a direct and proximate result of the Fluorosurfactant Defendants' acts and omissions, Plaintiffs and Class Members have and will continue to suffer damages.

<u>NINTH CLAIM FOR RELIEF</u>
BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(DEFECTIVE DESIGN)
(Against Fluorosurfactant Defendants)

239. Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

240. The Fluorosurfactant Defendants, as manufacturers of AFFF/Component Products containing PFOS, PFOA, and/or their chemical precursors, owed a duty to all persons whom its products might foreseeably harm, including Plaintiffs and Class Members, and not to market any product which is unreasonably dangerous in design for its reasonably anticipated use.

241. The Fluorosurfactant Defendants' AFFF/Component Products were unreasonably dangerous for its reasonably anticipated uses for the following reasons:

   a) PFAS causes extensive soil and groundwater contamination, even when used in its foreseeable and intended manner;

   b) PFAS poses significant threats to public health; and

   c) PFAS creates real and potential environmental damage.

242. The Fluorosurfactant Defendants knew of these risks and failed to use reasonable care in the design of their AFFF/Component Products.

243. AFFF containing PFOS, PFOA, and/or their chemical precursors poses a greater danger to the environment and to human health than would be expected by ordinary persons such as Plaintiffs, Class Members, and the general public.

244.   At all relevant times, the Fluorosurfactant Defendants were capable of making AFFF/Component Products that did not contain PFOS, PFOA, and/or their chemical precursors. Thus, reasonable alternative designs existed which were capable of preventing Plaintiffs' and Class Members' injuries, including but not limited to AFFF without intentionally added PFAS.

245.   The risks posed by AFFF containing PFOS, PFOA, and/or their chemical precursors far outweigh the products' utility as a flame-control product.

246.   The likelihood that the Fluorosurfactant Defendants' AFFF/Component Products would be spilled, discharged, disposed of, or released into the environment and the contamination of soils and wells in Boxborough far outweighed any burden on the Fluorosurfactant Defendants to adopt an alternative design, and far outweighed the adverse effect, if any, of such alternative design on the utility of the product.

247.   As a direct and proximate result of the Fluorosurfactant Defendants' unreasonably dangerous design, manufacture, and/or sale of AFFF/Component Products containing PFOS, PFOA, and/or their chemical precursors, Plaintiffs' wells, groundwater, soils, and property have become contaminated, requiring costly investigation and remediation under Massachusetts law.

248.   The Fluorosurfactant Defendants knew that it was substantially certain that their acts and omissions described above would contaminate Plaintiffs' and Class Members' wells, groundwater, soils, and property. The Fluorosurfactant Defendants committed each of the above- described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or reckless disregard for Plaintiffs' health and safety, and/or property rights.

## TENTH CLAIM FOR
## RELIEF
### PRIVATE NUISANCE
(Against Fluorosurfactant Defendants)

249.   Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

250.   At all relevant times, the Fluorosurfactant Defendants, as manufacturers of AFFF/Component Products containing PFOS, PFOA, and/or their chemical precursors, knew or should have known PFAS chemicals were hazardous and harmful to real property, water, and human beings, and it was substantially certain that the method and manner of the Fluorosurfactant Defendants' PFAS design, manufacture, marketing, distribution, supply, and/or sale of PFAS would cause injuries and property damage to Plaintiffs and the Class Members.

251.   The Fluorosurfactant Defendants, through the negligent, reckless and/or intentional conduct as alleged in this Complaint, have contaminated the soil, groundwater, and real property owned and/or possessed by Plaintiffs and the Class Members.

252.   The Fluorosurfactant Defendants created a hazardous condition or activity on property that caused substantial and unreasonable interference with Plaintiffs' and the Class Members' use and enjoyment of their property. The Fluorosurfactant Defendants' interference has caused and is causing Plaintiffs and the Class Members to, among other things, refrain from usingtheir land to cultivate and grow fruit, vegetables, and other food and to refrain from using their water to drink, cook, or bathe, resulting in significant inconvenience and expense.

253.   The Fluorosurfactant Defendants' contamination with AFFF/Component Products containing PFAS, including but not limited to PFOS, PFOA, and/or their chemical

precursors of real property owned and/or possessed by Plaintiffs and the Class Members also has substantially interfered otherwise with the Plaintiffs' and Class Members' ability to enjoy their property, to avail themselves of their property's value as an asset and/or source of collateral for financing, and to use their property in the manner that each Class Member chooses.

254.    The Fluorosurfactant Defendants' conduct was intentional, negligent, and reckless, and its conduct constitutes a continuous invasion of the property rights of Plaintiffs and the Class Members.

255.    As a direct and proximate result of the Fluorosurfactant Defendants' design, manufacture, discharge, use, marketing, distribution, supply, and/or sale of AFFF/Component Products containing PFAS, including but not limited to PFOS, PFOA, and/or their chemical precursors and the exposure of the persons and/or property of Plaintiffs and the Class Members to PFAS resulting from the conduct of the Fluorosurfactant Defendants, Plaintiffs and the Class Members presently suffer, and will continue to suffer, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, annoyance, upset, aggravation, trauma, and inconvenience.

256.    Plaintiffs and the Class Members are therefore entitled to damages, costs, and a judgment that the nuisance be abated and removed.

ELEVENTH CLAIM
FORRELIEF
PUBLIC NUISANCE
(Against Fluorosurfactant Defendants)

257.    Plaintiffs and the Class Members re-allege and incorporate here the

allegations set forth above.

258.   At all relevant times, the Fluorosurfactant Defendants knew or should have known PFAS to be hazardous and harmful to real property and human beings, and it was substantially certain that its design, manufacture, marketing, supply, sale, use, emission, discharge, and/or distribution of AFFF/Component Products containing PFAS, including but not limited to PFOS, PFOA, and/or their chemical precursors would cause injuries and losses to the persons and property of Plaintiffs and the Class Members.

259.   Plaintiffs, the Class Members, and members of the public have a common right to enjoy their real property free of dangerous contamination of their land and water and to live their lives without exposure to unreasonable levels of highly toxic PFAS chemicals.

260.   The Fluorosurfactant Defendants' conduct in designing, manufacturing, marketing, distributing, supplying, and/or handling of AFFF/Component Products containing PFAS, including but not limited to PFOS, PFOA, and/or their chemical precursors deemed hazardous material under Massachusetts law—has contaminated groundwater that supplies water to Plaintiffs, Class members, and the public and substantially and unreasonably infringes upon and transgresses the public right of Plaintiffs and Class Members to enjoy their real property.

261.   The Fluorosurfactant Defendants knew or should have known that the AFFF/Component Products containing PFAS, including but not limited to PFOS, PFOA, and/or their chemical precursors they designed, manufactured, supplied, marketed, sold, and/or distributed would have a deleterious effect upon the health, safety, and well-being of people living in Boxborough, Massachusetts and the surrounding areas, including Plaintiffs

and Class Members.

262.   The Fluorosurfactant Defendants' design, manufacture, marketing, supply, sale, and/or distribution of AFFF/Component Products containing PFAS, including but not limited to PFOS, PFOA, and/or their chemical precursors. caused those who owned and/or lived on nearby properties, including Plaintiffs and Class Members, to come into contact with high levels of PFAS on a routine and constant basis, causing substantially elevated health risks resulting from exposure to dangerous levels of PFAS, as well as property damage and diminished property values.

263.   As a direct and proximate result of the Fluorosurfactant Defendants' design, manufacture, marketing, supply, sale, and/or distribution of AFFF/Component Products containing PFAS, including but not limited to PFOS, PFOA, and/or their chemical precursors, Plaintiffs' and the Class Members' common right to live free of dangerous, toxic substances was eliminated and/or severely diminished.

264.   As a direct and proximate result of the Fluorosurfactant Defendants' design, manufacture, marketing, supply, sale, and/or distribution of AFFF/Component Products containing PFAS, including but not limited to PFOS, PFOA, and/or their chemical precursors in Boxborough, Massachusetts and the surrounding area, PFAS chemicals contaminated the land and water owned, possessed, and/or used by Plaintiffs and Class Members, thereby exposing their bodies to PFAS.

265.   As a direct and proximate result of the Fluorosurfactant Defendants' design, manufacture, marketing, supply, sale, and/or distribution of AFFF/Component Products containing PFAS, including but not limited to PFOS, PFOA, and/or their chemical precursors, Plaintiffs and the Class Members will be forced to pay for the private removal

of contaminants from their property emanating from pollution of public water sources.

266.   As a direct and proximate result of the Fluorosurfactant Defendants' design, manufacture, marketing, supply, sale, and/or distribution of AFFF/Component Products containing PFAS, including but not limited to PFOS, PFOA, and/or their chemical precursors. and the resulting exposure of Plaintiffs and Class Members to PFAS, Plaintiffs and Class Members presently suffer, and will continue to suffer, real property damage, out of pocket expenses, personal property damage, loss of use and enjoyment of property, diminution in property value, annoyance, upset, aggravation, trauma, and inconvenience.

<u>TWELTH CLAIM FOR</u>
<u>RELIEF</u>
TRESPASS
(Against Fluorosurfactant Defendants)

267.   Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

268.   Plaintiffs are the owners, and actual possessors of real property which are routinely used for collecting drinking water.

269.   The Fluorosurfactant Defendants designed, manufactured, distributed, marketed, and/or sold AFFF/Component Products with the actual knowledge and/or substantial certainty that AFFF containing PFOS, PFOA, and/or their chemical precursors would, through normal use, release PFAS that would migrate into groundwater (including drinking water), causing contamination.

270.   The Fluorosurfactant Defendants negligently, recklessly, and/or intentionally designed, manufactured, distributed, marketed, and/or sold AFFF/Component Products in a manner that caused PFAS to contaminate Plaintiffs' and Class Members' property, soil, and groundwater.

271.    As a direct and proximate result of the Fluorosurfactant Defendants' trespass, Plaintiffs and Class Members have suffered and continue to suffer property damage requiring investigation, remediation, and monitoring costs.

272.    The Fluorosurfactant Defendants knew that it was substantially certain that their acts and omissions described above would threaten public health and cause extensive contamination of property, including groundwater collected for drinking. The Fluorosurfactant Defendants committed each of the above-described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or reckless disregard for the health and safety of others, and for Plaintiffs' and Class Members' property rights.


DATED: April 11, 2025                    Respectfully submitted,



                                         */s/ Leah M. McMorris*
                                         David C. Strouss, BBO#546253
                                         Christian Uehlein, BBO#667325
                                         Leah M. McMorris, BBO#681437
                                         **THORNTON LAW FIRM, LLP**
                                         84 State Street
                                         Boston, MA 02109
                                         (617) 720-1333
                                         lmcmorris@tenlaw.com